**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 21-20069-CR-ALTONAGA/TORRES

UNITED STATES OF AMERICA

      Plaintiff,

v.

ADRIANA PEREZ DE ALEJO,

      Defendant.

_____/

**REPORT AND RECOMMENDATION ON DEFENDANT'S**
**MOTION TO SUPPRESS STATEMENTS**

This matter is before the Court on Defendant Adriana Perez de Alejo's ("Defendant" or "AP") Motion to Suppress Statements. [D.E. 119].[1] Defendant seeks to suppress her incriminating post-arrest statements based on a Fifth Amendment challenge. An evidentiary hearing was held on September 20, 2021 and continued on October 1, 2021. Having carefully considered Defendant's motion and the government's response in opposition, and the testimony of the witnesses and the exhibits admitted at the hearing, and being fully advised in the premises, the Court recommends that Defendant's motion to suppress be **DENIED** for the reasons discussed below.

---

[1]     This matter was referred to the undersigned Magistrate Judge for hearing and Report and Recommendation. [D.E. 120].

## I.     FACTUAL FINDINGS

### A.     *Defendant's Recovery and State Court Proceedings.*

It is undisputed that Defendant is a former methamphetamine addict who, following an arrest by state law enforcement in September 2019, has been able to achieve a drug-free life with the assistance of the Miami-Dade County Drug Court program. After one year under the state drug court program's strict conditions, Defendant successfully graduated from the program and all state charges were dismissed. [D.E. 119, Ex. A].

### B.     *The Arrest and Interview of Defendant.*

Although it is commendable that Defendant has worked so hard find success in her recovery, her past substance abuse may have caught up with her again. On April 9, 2019, Defendant allegedly engaged in the conduct that forms the basis for the one-count, federal indictment charging her with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). [D.E. 3 at 2]. Defendant does not argue – nor does she provide evidence to support the finding – that the alleged conduct at issue in this federal case was previously at issue in her state drug court proceedings. By contrast, Defendant notes that the events alleged in the federal indictment occurred during the time when she was "battling a severe long-term substance abuse addiction." [D.E. 119 at 1].

On February 10, 2021, days after the indictment was returned by the grand jury, law enforcement agents arrested Defendant and transported her to the FBI

Miami Field Office.  Soon after her arrival, Defendant was placed in a video-recorded[2] interview room and handcuffed to a steel bar.  After some time, two FBI agents entered the room, introduced themselves, placed an "Advice of Rights" form[3] in front of Defendant, and began the following exchange.

> FBI:   Before we talk, this is just an Advice of Rights form. I'd like you to read it and let me know if you consent to it.

One of the FBI agents removed Defendant's handcuffs and continued.

> FBI:   So, basically read it and let me know if you consent to it – to talk to us – and then we'll start talking.

Defendant grabbed the Advice of Rights form off the interview table and appeared to read it for the next 30 seconds. The Advice of Rights form stated the following:

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

---

[2]     The video recording of Defendant's interview was admitted into evidence at the hearing as Government Exhibit 1. It has been reviewed by the Court.

[3]     The Advice of Rights form was also admitted into at the hearing as Government Exhibit 2.

**CONSENT**

> I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

> Signed: _____

After apparently reading the Advice of Rights form for about 30 seconds, one of the FBI agents handed Defendant a pen and told her where to sign. Defendant promptly signed on the signature line beneath the "CONSENT" subheading.

At no time was Defendant advised of her *Miranda* rights *orally*, nor was an *oral* confirmation that she understood her *Miranda* rights sought by the FBI agents during the interview, even though the FBI agent who testified at the hearing said he believed that Defendant – a known methamphetamine user – was "a little bit high" at the time. Nevertheless, Defendant testified at the hearing that, on the day of the interview, she was sober and generally capable of speaking and reading the English language.[4]

About one minute after waiving her *Miranda* rights in writing, as one of FBI agents tucked away the signed Advice of Rights form and muttered about his desire to ask Defendant about "some people," Defendant interrupted with a question.

> AP:   To be clear, you guys are not taking me to court? This is right here (hand motion directed at the FBI's interview room).

> FBI:   No, what do you mean?

> AP:   Yeah, they said that you guys are taking me to court to see somebody.

---

[4]   At the hearing, Defendant distinguished between her ability to read and her ability to comprehend what she was reading during a cold, anxiety-inducing, custodial interrogation.

FBI:    You are going to court. Let me explain to you real quick the process. So, just so you know, you've been processed. Right? Fingerprints. Everything. We're going to talk to you now for a second. From here, we are going to transport you downtown to the Federal Detention Center. Okay? You're here based on federal charges. Okay? Possession with intent to distribute methamphetamine.

AP:     (unintelligible).

FBI:    I'm sorry.

AP:     (unintelligible).

FBI:    Just hear me out. So, it's federal charges. We're going to transport you to the Federal Detention Center at which time tomorrow you'll have what's called initial appearance. In the course of that initial appearance, what they'll do – they're going to formally read you your charges. Right? They're going to go over your rights with you. They are going to take you through a series of questions to determine whether or not you can afford an attorney or one needs to be appointed to you. Alright? After that initial appearance, three to five days later, it depends, you'll be afforded what's called a bond hearing and/or pretrial detention hearing; they're more or less one in the same. That determination is going to depend upon, well, at the end of that, you'll know whether or not you're going to bond out or be detained until your next court appearance. What factors into that are a number of things. Right? Your immigration status, risk of flight, your criminal history, danger to the community – there's kind of a three-prong assessment that they'll go through to determine whether you bond out or you're detained. So, that's what you're looking at.

AP:     I don't understand.

FBI:    Did you turn yourself in? Did you turn yourself in?

AP:     When?

FBI:    When they called you, did you turn yourself in? Did you show up when they asked you to?

AP:     Yes. I gave them my address.

FBI:   That's very good. That's a good sign.

AP:    But I don't understand these charges that I –

FBI:   That's okay. I'll explain that right now. I'll explain that right now.

AP:    I went to drug court. I –

FBI:   I know this is emotional for you, but I'll explain what kind of questions I have for you, and what specific event I want to refer to, and then you can talk more about it. Okay? So, in order to get to that specific event a bit quicker, do you know this guy?

Defendant then proceeded to answer a series of questions from the FBI agents, making several inculpatory statements about the "specific event" that one of the FBI agents previously alluded to.

Defendant credibly testified that she could read the English language and was unimpaired on the day of the interview. Thus, in conjunction with the video recorded interview and the signed Advice of Rights form, which was written in plain English and effectively enumerated each *Miranda* right, the government has proven by a preponderance of the evidence that Defendant voluntarily, knowingly, and intelligently waived her *Miranda* rights.

### C.   *Motion to Suppress.*

Defendant nevertheless argues that her written *Miranda* waiver is invalid because she did not understand her *Miranda* rights and, therefore, could not have voluntarily, knowingly, and intelligently waived those rights prior to making inculpatory statements to the FBI agents. In support of her argument, Defendant highlights the express confusion that she communicated to the FBI agents after she

signed the Advice of Rights form. Under the circumstances, she draws a distinction between her general ability to read English and her specific ability to effectively comprehend the English words on an Advice of Rights form that was presented to her at the onset of a custodial interrogation. Accordingly, she argues, the Fifth Amendment to the Constitution of the United States requires that these inculpatory statements be suppressed.

## II.    ANALYSIS

### A.    *The Legal Framework.*

In *Miranda*, the Supreme Court established procedural safeguards that require law enforcement agents to advise criminal suspects of certain constitutional rights before they may initiate a custodial interrogation:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Additionally, the suspect must be afforded the opportunity to exercise those rights throughout the interrogation. *Id*. After the *Miranda* warnings are given, and the opportunity to exercise those rights is afforded, the suspect may voluntarily, knowingly, and intelligently waive those rights and make admissible statements to law enforcement agents. *Id*. In the absence of such warnings and waiver, however, evidence obtained as a result of the custodial interrogation will be inadmissible. *Id*.

No precise formulation of the *Miranda* warnings is mandated. *California v. Prysock*, 453 U.S. 355, 359 (1981) ("This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant."). To the contrary, "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures. *Id.* The prophylactic *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (citing *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)). Accordingly, a court considering this issue "need not examine Miranda warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*." *Id.* (citing *Prysock*, 453 U.S. at 361); *see also United States v. Woods,* 684 F.3d 1045, 1055 (11th Cir. 2012) ("The *Miranda* warnings need not be perfect; rather, the warnings need only 'reasonably convey[]' the defendant's rights."). Thus, so long as the warnings given to a suspect adequately meet *Miranda's* substantive requirements, they are sufficient. *Duckworth*, 492 U.S. at 203.

The Court must make two distinct findings in order to conclude that a defendant's statement was made after a knowing and voluntary waiver of the *Miranda* rights. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the decision to relinquish the rights and make a statement must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or

deception." *Id*. Second, the decision must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. In sum, the *Miranda* waiver must be both voluntary and knowing.

When the government seeks to admit a defendant's inculpatory statement at trial, as it does here, the government must prove by a preponderance of the evidence that the defendant voluntarily and knowingly waived her *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Only if the totality of the circumstances of the interrogation reveal both "an uncoerced choice and the requisite level of comprehension" may a court properly conclude that *Miranda* rights have been waived. *Moran*, 475 U.S. at 421. This requires the government to show that the *Miranda* warnings were given to the defendant, that the defendant understood his *Miranda* rights, and that the defendant then made an uncoerced statement. *Berghuis v. Thompkins*, 560 U.S. 370, 384-85 (2010).

## B. *Free and Deliberate Choice.*

The first inquiry under *Moran* is whether Defendant's statement was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. And the Supreme Court made clear in *Connelly* that the purpose of the Fifth Amendment privilege against self-incrimination is to protect individuals from official coercion, and therefore the "voluntariness" of a waiver of that privilege depends not on free choice in the abstract, but on the absence of police overreaching. *Connelly*, 479 U.S. at 169-70. For that reason, in *Connelly*, the Supreme Court found a suspect's waiver to be

voluntary in spite of evidence that the suspect's confession was not the result of free choice, but the result of a mental illness that compelled him to confess. *Id*. at 170-71. Thus, the Supreme Court emphasized that the Fifth Amendment privilege is not concerned with extraneous forces, such as mental illness, that compel a suspect to confess, but only with pressure that emanates from official sources. *Id*.

Here, the Court finds that there is no evidence that the FBI agents used any intimidation, tactics, threats, or physical or psychological pressure in order to compel Defendant to make a statement. Furthermore, the Court finds that the FBI agents did not act intentionally to trick or confuse Defendant. The video of the short interrogation indeed reflects just the opposite. The agents explained their investigation and the accusation against her in a straightforward manner. Defendant has not argued, least of all shown, that the FBI agents intentionally acted to coerce Defendant to waive her *Miranda* rights. Accordingly, the first prong of *Moran* is satisfied because Defendant's statement was the product of a free and deliberate choice rather than any official coercion.

### C.    *Full Awareness of the Rights Being Waived.*

Defendant does directly and forcefully challenge, however, whether the second inquiry under *Moran* has been established. That inquiry asks whether Defendant waived her *Miranda* rights with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. Like the first inquiry, the "full awareness" requirement aims to distinguish between statements that are the product of a free choice and those that are compelled

by official coercion because the *Miranda* framework presumes that custodial interrogations are inherently coercive. *Id.* at 455-56 ("[T]he very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals."). To dispel this inherent pressure, the rights afforded by the Fifth Amendment must be explained to the suspect in an effective and express manner. *Id.* at 473.

Once a suspect understands the rights afforded to her, the *Miranda* framework presumes a subsequent waiver to be knowing. For this reason, once understanding is established, it is the suspect's responsibility to clearly invoke any right he or she wishes to assert. *See Berghuis*, 560 U.S. at 381-82  (placing onus on suspect to invoke right to silence by holding that police may continue questioning until suspect unambiguously states he or she wants to remain silent); *see also Davis v. United States*, 512 U.S. 452 (1994) (holding that police have no duty to clarify equivocal requests for counsel and may continue questioning until suspect clearly requests counsel). But first the prosecution must show that the suspect understood her *Miranda* rights. *Berghuis*, 560 U.S. at 384-85. This is a threshold requirement, which is the bulwark against the inherently coercive nature of custodial interrogations. *United States v. Lewis,* 2012 WL 6569373, at *5 (S.D. Fla. Dec. 17, 2012).

Here, Defendant argues that the government cannot meet its burden because of the confusion expressed by Defendant after she signed the Advice of Rights form. In response, the government argues that Defendant understood her *Miranda* rights because she reviewed the Advice of Rights form at the beginning of the interview and

then affirmed in writing that she understood those rights and was willing to answer questions without a lawyer present. The government points out that any confusion she expressed had nothing to do with the rights she had waived. So given the circumstances there is no basis to find she did not understand her rights.

### i. *Reliance on a Written, Non-Verbal Warning.*

Defendant does not dispute that she signed the Advice of Rights form provided to her by the FBI agents at the beginning of the interview. And, to be clear, the government does not dispute that the interview following Defendant's signature on the Advice of Rights form qualified as a custodial interrogation, implicating the need for a *Miranda* waiver before any of the statements Defendant made during the interview could be admissible at trial. But the parties do dispute whether, based upon the totality of the circumstances, Defendant understood her *Miranda* rights at the time she abandoned them.

Defendant focuses first on the undisputed fact that the FBI agents did not *verbally* review her *Miranda* rights with her, instead relying solely upon the *written* Advice of Rights form to inform Defendant of her *Miranda* rights and confirm her understanding and relinquishment of those rights. The Court is not persuaded that the absence of a verbal review of the *Miranda* rights legally vitiates the validity of Defendant's written waiver (and Defendant provides no case law or factual evidence to support the argument that it should).

In the vast majority of cases, courts will infer that the defendant understood his rights from the fact that police read the defendant the *Miranda* rights litany and

the defendant signed a *Miranda* waiver. *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility[.]"). But the "mere recitation of the litany" will not suffice in every case. *Id*. at 611; *see also Hart v. Attorney Gen. of the State of Fla*., 323 F.3d 884, 893 (11th Cir. 2003) ("Although a signed *Miranda* waiver form is 'usually strong proof' that a suspect voluntarily waived his rights, it is not conclusive on the issue."). Only by "effective and express explanation" of the *Miranda* rights can there by assurance that the defendant was truly in a position to exercise them. *Miranda*, 384 U.S. at 473.

Here, it is evident from the Advice of Rights form as well as the video recording of Defendant's interview that Defendant reviewed the Advice of Rights form, which clearly advised Defendant in writing of her *Miranda* rights, before she affirmed in writing that she understood those rights and was willing to relinquish them at that time. And the evidence presented at the hearing showed that Defendant could understand, speak, and read the English language, which was the language used in the Advice of Rights form. Defendant testified, however, that the process of arrest and interrogation caused her to suffer an anxiety attack that disabled her reading comprehension skills during the time when she reviewed the Advice of Rights form. Thus, the first threshold issue she presents is whether the Fifth Amendment always mandates verbal confirmation of Defendant's understanding of the *Miranda* rights in addition to the written confirmation. The answer is no.

Where the defendant reads and understands a written litany of *Miranda* rights, then an additional verbal review of those rights is not necessary for the

government to prove that the defendant validly waived those rights. *Compare, e.g., United States v. Van Dusen*, 431 F.2d 1278, 1281 (1st Cir. 1970) (finding a valid waiver where a literate defendant was advised of his *Miranda* rights in writing only, read and understood those rights, refused to sign the Advice of Rights form, and later verbally waived his *Miranda* rights), *with State v. Keller*, 845 N.E. 2d 154, 163 (Ind. Ct. App. 2006) (affirming suppression of statements where the defendant was advised of his *Miranda* rights in writing only but evidently did not read the Advice of Rights form before signing it and no oral confirmation of understanding was obtained). Here, it is undisputed that Defendant knows how to read English and she confirmed in her testimony that she did in fact read the document.  The video proves that she did. Hence, the fact that her *Miranda* rights were presented to her only in written English, without oral confirmation before or after, does not automatically invalidate her written waiver.

That is especially clear when one considers that the converse is true: giving an oral statement despite having refused to sign a written waiver form may still amount to a valid *Miranda* waiver.  The Eleventh Circuit affirmed the denial of a motion to suppress that was premised only on a subsequent oral statement that followed express refusal to sign the form.  *United States v. Middleton,* 245 F. App'x 867, 871 (11th Cir. 2007) ("Nor does the fact that Middleton made his admission after indicating that he would not sign the rights waiver form suggest that his inculpatory admission was somehow coerced or that it was involuntary.").  As that decision recognized, there is an implied oral waiver, which officers were entitled to rely upon,

when a suspect begins making statements after refusing to sign the form.  *See also*
*United States v. Dowd,* 451 F.3d 1244, 1250-51 (11th Cir. 2006) (a defendant may
voluntarily make statements (thereby impliedly waiving his *Miranda* rights), even in
the wake of his refusing to sign a written waiver of rights).

So it follows that a valid written and signed waiver may be relied upon even if
no oral confirmation is conveyed because one can, at minimum, conclude that
Defendant impliedly waived her *Miranda* rights.  But apart from that, the video also
reflects that the agent told her what the form was for when he presented it to her:  to
confer whether she "consents" to the interview.  So in fact there was oral confirmation
at the time of the purpose behind the form in addition to the specific *Miranda*
warnings and signed waiver included in the form.  We thus find it meritless to
contend in blanket fashion that the *Miranda* warnings were ineffective when agents
rely primarily on a written Advice of Rights form.

### ii.  *Legally Insufficient Confusion.*

To reiterate, it is the government's burden to prove by a preponderance of the
evidence that, based on the totality of the circumstances, Defendant understood her
*Miranda* rights before waiving them. *See Berghuis*, 560 U.S. at  384-85; *Moran*, 475
U.S. at 421. The evidence adduced at the hearing clearly shows that Defendant was
presented with a written *Miranda* warning, that she knew how to read that *Miranda*
warning, and that, after reading that *Miranda* warning, she signed and
acknowledged her waiver of her *Miranda* rights. And nothing in the video evidences
any confusion or hesitation about her right to remain silent.

Thus the government has met its initial burden of showing the waiver was voluntary based on these facts.  Generally, when a defendant expresses confusion following a *Miranda* warning, that confusion must relate to a specific *Miranda* right to merit a finding that the defendant did not understand her *Miranda* right and, therefore, was incapable of knowingly waiving that right. *See Hart*, 323 F.3d at 893-94; *United States v. Lewis*, 2012 WL 6569373, at *7-8.

Yet, Defendant argues that the totality of the circumstances proves otherwise. She indeed relies on these same cases to support her position that the confusion she expressed after signing the form required the agents to confirm that she in fact understood the rights she had just acknowledged in writing.  Defendant also juxtaposes this record with examples of other interviews conducted that day that evidence a greater level of responsiveness on the part of the interrogating agents that clarified for other suspects what the *Miranda* waiver consisted of.

The problem Defendant has, however, is that the Fifth Amendment does not codify a "best practices" manual for interrogations.  Whether other agents did a better job with other suspects does not matter.  The issue is whether *these* agents' sloppiness, as characterized by Defendant, rendered an otherwise valid *Miranda* waiver form useless under the Fifth Amendment.  A review of the cases she relies on shows that they do not support her theory.

In *Hart*, a detective "went to great lengths to apprise Hart of his rights" by carefully explaining each *Miranda* warning to him. *Id*. at 893. After hearing this explanation, Hart signed a rights waiver form to indicate that he understood each of

16

the rights and that he was willing to speak to the detective without a lawyer. *Id.* Hart then asked to speak with a different detective, Detective Schuster, with whom he was previously familiar. *Id.* at 894. When Schuster arrived, Hart asked her what were the pros and cons of hiring a lawyer. *Id.* This undermined the earlier *Miranda* waiver because "Although asking for the pros and cons of hiring a lawyer is not an unequivocal request for counsel, it does indicate that Hart did not fully understand his right to counsel and was asking for clarification of that right." *Id.* The Eleventh Circuit then found problematic two other statements that Schuster made in response to Hart's inquiry. First, Schuster told Hart that one of the cons of asking for a lawyer was "I'm going to want to ask you questions and he's going to tell you you can't answer me." *Id.* By doing so, Schuster contradicted the purpose of the *Miranda* warnings, which is to protect a suspect's privilege against self-incrimination. *Id.* Second, Schuster told Hart that "honesty wouldn't hurt him." *Id.* This statement was contrary to the *Miranda* warning that anything Hart said could be used against him in court. *Id.* Given the totality of circumstances surrounding the interrogation, and specifically based on these coercive statements that ran counter to the point of the *Miranda* warnings themselves, the Eleventh Circuit understandably found that, "[Hart] did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it." *Id.* at 495.

Similarly, after the defendant received a *Miranda* warning in *Lewis*, he expressed confusion about whether he would have to pay for an attorney in order for an attorney to be present during the interrogation. *Lewis*, 2012 WL 6569373, at *7.

17

The officers did not sufficiently clarify this issue and, because the defendant's interrogation proceeded even though he did not fully understand the nature of his right to counsel, his confusion vitiated his *Miranda* waiver. *Id*. at \*10 (citing *Hart*, 323 F.3d at 895).

The record in this case could not be more different from these two situations. Here, Defendant expressed confusion two to three times during the interview, but the video recording proves that her confusion related more to the charges against her than the content of the Advice of Rights form.

To begin with, immediately after reading and signing the Advice of Rights form, Defendant had a question. But what followed was not a lack of understanding as to what the form meant; as to what her right to remain silent was; or as to what her right to counsel required.  Instead the very first expression of confusion on her part related directly to whether she was going to "court." In response, contrary to the facts in *Hart* and *Lewis*, the agents did not respond with misleading or coercive statements.  The immediate response from one of the FBI agents truthfully confirmed that she would be going to court because she had been charged with a federal drug crime. Without asking whether that resolved her confusion, that FBI agent then proceeded to explain the processes that should expect to endure over the coming days (i.e., her transport to the Federal Detention Center in Miami, her initial appearance, and her pretrial detention hearing).

Second, in response to that procedural explanation, Defendant again said, without qualification, that she did not understand. Again, assuming the nature of her

18

confusion was still about the court process, the FBI agents attempted to resolve her confusion by putting her at ease with regard to the pretrial detention hearing. The Court finds that response to be credible because the review of the video objectively shows that any reasonable officer would have responded accordingly.  Nothing she said would have led a reasonable officer to believe she was referencing the Advice of Rights form or otherwise did not understand the rights she had waived.

And then, for the third time, Defendant expressly communicated that she did not "understand these charges" against her and that she "went to drug court." In response, one of the FBI agents communicated that he would explain the "specific event" the indictment related to.  Again, her failure to understand did not relate to the waiver of her rights.   Indeed she made no reference to anything that would implicate her right to remain silent or her right to counsel during questioning.  And the agents' responses to her were all factual, uncoercive, and clearly not misleading in any way.

So, unlike *Hart* and *Lewis*, Defendant never tied her confusion in the interview to any core *Miranda* right. Had she done so, the FBI agents may then have been obligated to effectively clarify those *Miranda* rights or ask her open-endedly what she did not understand. Instead, her expressed confusion either related to nothing explicit or at minimum to matters disconnected from *Miranda*, principally the nature of the charges against her.  That does not violate *Miranda* and presents no basis to suppress her responses to the agents' questions. *See United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010) (distinguishing between a suspect's awareness of

"constitutionally significant information about the nature of the right being waived, and information that merely affects the wisdom of the decision to waive.").

Defendant testified at the hearing, however, that she was confused about *everything,* from the substance of her charges as well as the nature of her *Miranda* rights, because the arrest and subsequent interview caused her to suffer an anxiety attack, which disabled her reading comprehension skills and thereby made the Advice of Rights form an ineffective medium of communication. Although it is not surprising that she honestly suffered anxiety brought on by her arrest and custodial interrogation, the record, especially our review of video recording of the interview, shows that her emotional state did not affect her ability to understand the Advice of Rights form as opposed to her arrest itself.

As a result we are not persuaded that Defendant was so confused or anxiety-ridden about this process that it totally disabled her reading comprehension skills, rendering the written *Miranda* warning ineffective.  And certainly the agents were not duty-bound to divine that her confusion ran that far when Defendant gave no indication at the time.  The Eleventh Circuit has time and again rejected a purely subjective assessment of understanding from the defendant's perspective.  Rather, the totality of circumstances analysis focuses on the objective indicia of a suspect's mental state or capacity.  *See United States v. Sonderup,* 639 F.2d 294, 297-98 (5th Cir. 1981) (motion to suppress on *Miranda* grounds denied because "we must rely on the objective indicia of a defendant's mental state in order to determine whether a voluntary, knowing and intelligent waiver was made. These objective indicators are

that the defendant was informed in clear and unequivocal terms of each of his Miranda rights and that the defendant said, or by his conduct indicated, that he understood them and wished to waive them."); *United States v. Richardson,* 732 F. App'x 822, 827 (11th Cir. 2018) (no basis to suppress confession from mentally disabled suspect under *Miranda* where "objective indicia here support the district court's conclusion that Appellant was sufficiently competent to waive his rights. The record shows that an FBI agent read all the *Miranda* rights to Appellant, and after each line Appellant acknowledged his understanding. Appellant even asked clarifying questions (which the agents answered) and carried on a conversation with his interrogators.").

The objective indicia here, which are fully revealed by the video recording, evidences no confusion as to the nature of the rights being waived or that Defendant was unable to understand what she was reading. And most importantly, whether in cases involving mentally challenged, intoxicated, or immature juvenile suspects, the totality analysis will overcome subjective after-the-fact claims of lack of understanding where there is no basis to find that agents took advantage of those limitations to coerce a confession. For instance, the Eleventh Circuit rejected a juvenile's after-the-fact claim that he did not actually understand what he was doing when he waived his rights where there was no showing that agents unduly coerced the juvenile or took advantage of his immaturity to do so. *See Hall v. Thomas,* 611 F.3d 1259, 1288 (11th Cir. 2010) ("Although Hall testified at the suppression hearing that he could not understand his rights, he also admitted that he could in fact read

and did not deny the officers twice read out loud his state juvenile rights and adult *Miranda* rights. Hall has not shown that his intelligence was so low that he could not understand his rights or the consequences of his waiver."). The same was true of a mentally challenged suspect, whose confession was not invalidated when no evidence revealed that law enforcement took advantage of the disability. *Richardson*, 732 F. App'x at 827 (" 'a mental disability does not, by itself, render a waiver involuntary[.]' *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). . . . Instead, courts look to see whether there was coercion by an official actor; for example, if police take advantage of a suspect's mental disability.").

Unlike a juvenile or mentally disabled suspect, Defendant was a lucid, intelligent adult, familiar with the justice system, who expressed no reservation about waiving her rights and allowed the interview to proceed. Her after-the-fact expressions of confusion, even if sincere, do not undermine the voluntariness of her waiver at the time it was made. *Cf. United States v. Chancellor*, 2008 WL 622937, at *11-12 (S.D. Fla. Feb. 8, 2008) (finding that the defendant was unable to understand the substance of a *Miranda* warning when he had an extremely low IQ, was intoxicated with drugs and alcohol, and had suffered a taser injury shortly before the interrogation).

In summary, Defendant credibly testified that she could read the English language and was unimpaired on the day of the interview. Thus, in conjunction with the video recorded interview and the signed Advice of Rights form, which was written in plain English and effectively enumerated each *Miranda* right, the Court finds that

the government has proven by a preponderance of the evidence that Defendant voluntarily, knowingly, and intelligently waived her *Miranda* rights. No Fifth Amendment violation has been shown.

## III.  CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge does hereby **RECOMMEND** that Defendant Adriana Perez de Alejo's Motion to Suppress Statements [D.E. 119] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have until October 8, 2021 to serve and file written objections, if any, with the Honorable Cecilia Altonaga, Chief United States District Judge. The Court finds good cause to expedite the objection period as per Rule 4(b). Any response is due by October 15, 2021. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C v Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 2nd  day of October 2021.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge